F. F. FILGER, Jr., et al., Appellants,

v.

PUBLIC WATER SUPPLY DISTRICT NO. 1, OF CLAY COUNTY, Missouri, Respondent.

No. 23335.

Kansas City Court of Appeals.

Missouri.

April 3, 1961.

Wm. Harrison Norton, Wilbur L. Pollard, North Kansas City, William & Norton, North Kansas City, of counsel, for appellants.

James C. Davidson, North Kansas City, Robert F. Sevier, Liberty, Sevier & Turnage, Liberty, of counsel, for respondent.

MAUGHMER, Commissioner.

The defendant Public Water Supply District No. 1 of Clay County, Missouri is now and has been since 1937, a public water supply corporation, organized under the laws of Missouri (Sections 247.010 to 247.-220 V.A.M.S., 1949, originally Laws, 1935, pages 327 to 337, Sections 12, 620–12,638, R.S.Mo.1939). Plaintiffs are owners of a 65-acre tract lying north of Englewood Road and west of Old Pike Road in Clay County, within the confines of the Water District and on which there exists a trailer park with sites for some 250 trailers. The trailer camp was opened in 1954.

On March 9, 1959, plaintiffs sued defendant corporation for damages bottomed upon its alleged failure and refusal during the winter of 1953–54, to furnish an adequate water supply for the trailer court. At the time of the suit plaintiffs had secured water from the Parkville Water Company for the project and their claimed measure of damages is the additional cost thereof in the amount of $12,000. It appears that jurisdiction lies with this court. Section 477.040, V.A.M.S. The verdict and judgment was for defendant and plaintiffs have duly appealed.

In September, 1953, plaintiffs began development by excavating, grading and landscaping of a trailer court which they named Lakeview Terrace Mobil Park. They made application for and were successful in getting the tract zoned for a trailer park with an authorized expansion to 600 units. The area was not serviced by any water supply. During the winter of 1953–54, when this controversy arose, defendant's only water lines in the immediate area were two 2-inch

dead end cast iron mains located on Old Pike Road and about 600 feet from the trailer project. There was evidence that the whole area served by the water company had developed rapidly with the result that its capacity was severely taxed and with numerous complaints as to inadequate water pressure. The company was required to pay the construction costs of additional water mains out of existing funds and there was little, if any, surplus in its treasury.

At the time of the trial Mr. Filger said his motor park consisted of approximately 120 units. The project as developed in 1954, made provision for 250 units with room for expansion. For one-family dwellings located adjacent to this 2-inch main on Old Pike Road the company permitted only a ⅝ths inch tap. This was adequate for a family dwelling, but wholly inadequate to supply water for a community-user consisting of 100 or 250 unit users such as was planned for the trailer park. Plaintiffs first sought permission to tap defendant's Old Pike Road water main with a 2-inch connection, but later expressed a willingness to accept a 1½-inch connection. There was evidence that a tap of such size on a 2-inch main, particularly a dead end main, would reduce the pressure, especially for the beyond-the-tap-users, most unreasonably.

Mr. Filger made three specific efforts to procure an adequate supply of water from defendant company. On or about October 1, 1953, he talked with Mr. William Geary, the then manager and secretary of defendant company. As a result of this conversation Geary and Filger met the following day on the premises. They looked over the situation and Geary, according to Filger's testimony, agreed to present the matter to the Water Company Board. About November 1, 1953, Mr. Filger called the company office by telephone and again talked with Mr. Geary, who, he said, advised him that the company was low on funds and "could not build the line for me". Filger said he told Geary that he "would build a 2-inch line down the county road,

Shady Lane, to Old Pike, a 2-inch galvanized line, or I would let Mr. Geary build the line and me pay for it, whichever way they wanted to do it". Mr. Filger said he went to defendant company's office about six weeks later and again saw Mr. Geary and was given a slip to fill out, but the company would not take his money. About February 1, 1954, Mr. Filger said he again went to defendant's office; that Mr. Geary and Mr. W. J. Schiller, president of the company (who was deceased at the time of trial) were present; that he was told the District could not furnish the amount of water he wanted nor would it permit a 1½-inch tap on the 2-inch line; that he offered to build a 10,000 gallon water tank and take the water at night during the off-peak period, or offered to build a pipe line to defendant's 4-inch line in Brady Hills. He said he was advised that these propositions would have to be taken up with the Board.

Under date of March 12, 1954, the company wrote Mr. Filger as follows:

"Mr. Ferd Filger, Jr.
"Parkville, Mo.
"Dear Mr. Filger:
    "In reference to your request for a 2-inch water hookup located on Pike Road east of the proposed trailer park to be used for temporary service for construction work, the board of directors instructed me to furnish a ⅝ meter service from our existing 2-inch cast iron main. You are aware of the fact that this existing 2-inch water line would not be adequate to serve a camp as large as you have indicated.
    "We trust this service will take care of emergency need of water for construction purposes.
    "Yours truly
    "Public Water Supply District #1
    "(Signed)      Wm. J. Geary
                        "Manager."

The plaintiffs had no further contact with the Board or its officers except that their attorney in the zoning matter, Mr. Arthur Kincaid, wrote a letter to the Board

and received a letter in reply from him. We quote in full from Mr. Kincaid's letter dated March 19, 1954:

"Mr. W. J. Schiller
"President, Public Water Supply
"District No. 1, Clay County
"Gashland, Missouri

"Re: Ferd Filger, Jr.

"Dear Mr. Schiller:

"The above named desires immediate connection with your water system for use of property which he has contracted to purchase in the district. It is our understanding that you are entirely familiar with the location of the property involved.

"Mr. Filger is willing to make the connection without expense to the district and his minimum requirements are a 1½″ tap on a 2″ meter.

"Is your district in a position to accommodate him or is he entirely free to purchase his water from another district?

"Yours very truly,
"(Signed)    Arthur R. Kincaid".

By its letter of March 25, 1954, the Water Company replied as follows:

"Mr. Arthur R. Kincaid
"c/o Lawson, Hale & Coleberd
"Liberty, Missouri
"Dear Mr. Kincaid:

"Replying to yours of the 19th inst. Re: Supplying water to Ferd Filger, Jr.

"We have advised Mr. Filger that in order to take advantage of his right as a tax payer all he has to do is put up $50.00 for a tap and $5.00 to insure payment of his monthly bill. For this we will give him a ⅝″ meter which is all the present line will justify to protect the rights of the other water users. This area is served by two 2″ dead end mains and in order to give him the volume he is asking for it will entail the installation of larger mains

from his source of supply as well as a tie in. This is going to be quite expensive not only from the cost of the pipe but large amounts of rock which will be excavated. Our franchise reads that all extensions must be made out of revenue and due to the present heavy strain on our obligations this cannot be done at this time.

"On a regulation tap, we make the connection regardless as to the side of the road and install the meter and fittings on the property line and the customer takes it the rest of the way.

"As to obtaining water from some other source will say that we have no jurisdiction over this but will say that if we do put in the tap and the customer elects to augment his supply by wells, cisterns or some other water supply system we will not condone the two being connected due to the possibility of bacteria getting into our system.

"Trusting this is the information you wanted we are,

"Yours very truly
"Public Water Supply District #1
"(Signed)
"W. J. Schiller, President".

The following two excerpts from the minutes of meetings of the Board on October 7, 1953 and March 10, 1954, were received in evidence: "The board could not recommend the laying of water mains to Filger Trailer Court because the cost of construction was prohibitive. Signed Dwight L. Moody, acting President, William J. Geary, Clerk." "The board instructed Mr. Geary to inform Mr. Filger it would not be possible to make taps on our existing 2-inch main larger than ⅝-inch regular house service. The Board instructed Mr. Geary to inform Mr. Filger it is of the opinion this would not be large enough to serve the proposed trailer camp. Signed, Dwight L. Moody, acting President. William J. Geary, Clerk."

Early in 1954, when plaintiffs were seeking a supply of water for the trailer park

it was impossible to estimate definitely the amount which would be required for their purposes. The area actually developed provided spaces or sites for 250 trailer units. Under the zoning order expansion to 600 units was authorized. The Parkville Water Company records show that for six months in 1954, plaintiffs' actual consumption was 944,200 gallons; for 1955, 2,747,000 gallons; and for 1957, 3,442,800 gallons.

■ Responsive to interrogatories, defendant delivered to plaintiffs a letter setting forth by cubic feet measurement the total consumption of the entire water district for the years 1953–54–55. Presumably and properly this information would aid the Court and jury in making a judgment as to the comparative amount by which plaintiffs' requirements would increase the District's total consumption. Defendant's clerk in compiling these figures, inadvertently left off a zero on each total, thereby setting forth the total as only one-tenth of the correct figures. For example, for 1953, the figure given was 1,547,810 cubic feet, whereas it should have been 15,478,100 cubic feet. Estimating 7½ gallons of water per cubic foot shows that the total gallonage dispensed in the District during 1955 was 116,085,750 gallons. Based upon plaintiffs' 1955 actual usage of 2,747,000 gallons, their take would have amounted to approximately 2½ percent of the District's total outflow. This error was discovered after the evidence was in and while counsel were in court chambers making final preparations for submission of the case. The mistake was uncovered by defendant's engineer. Defendant's counsel offered and agreed that the case might be reopened and the corrections presented to the jury. Plaintiffs' counsel declined to do this and elected to stand on the record as it then existed. Plaintiffs' second assignment of error asserts they are entitled to a new trial because their rights were prejudiced as a result of this misinformation. We think the evidence was pertinent and the incorrect data was misleading, but plaintiffs were afforded an opportunity to present the corrected version to the jury. This they declined to do, and as a reason therefor say the engineers and other witnesses were gone and their evidence on the point, both through direct and cross-examination, was no longer actually and completely available. If plaintiffs believed this corrected evidence was vital, they had the extreme alternative of taking a nonsuit. Now under these circumstances can a plaintiff wilfully withhold the correction, keeping it in reserve as an ambush, with which to overturn the verdict in case it is adverse? We think not and rule the point against appellants.

The record evidence which we have set forth shows the Water Company approved and authorized a ⅝-inch tap, but refused to permit a 2-inch or 1½-inch connection. Thereafter plaintiffs procured a supply of water from the Parkville Water Company. Plaintiffs bought the pipe and installed the transmission line from the Parkville mains. It was plaintiffs' evidence that their cost was $12,000 greater than it would have been to connect with defendant company's line and they sought recovery of this amount in damages.

Mr. William G. Riddle, civil engineer, testified for plaintiffs and expressed the opinion that if plaintiffs installed a 10,000 gallon tank, equipped with a pressure pump, so as to take water when the source of pressure was high as at night, it would not materially affect the pressure from defendant's main 300,000 gallon tank. (From the testimony of engineer Myers and secretary Geary, it was developed later in the trial that this 300,000 gallon tank was not built until 1955).

Mr. Stanley K. Wade testified that he attended a community meeting one evening during the winter of 1953–54, and heard Mr. E. L. Berkebile, a member of the defendant Company Board, say the Board was only going to permit Filger to have a ⅝-inch tap which would be insufficient to meet State Board of Health requirements and so Filger was not going to get water for his trailer court. Mr. Berkebile denied having made any such statement.

Mr. Dwight L. Moody, acting president of the defendant's Board, testified that a ⅝-inch tap for the Filgers was authorized but the requests for a 1½ or 2-inch taps were refused.

Mr. W. W. Holloway, president of the Parkville Water Company, said Mr. Filger orally requested his company to furnish water for the trailer court; that he wrote defendant company about it and secured "its blessing" and then supplied the water.

Mr. E. I. Myers, defendant's consulting engineer, testified that in February, 1954, he was requested by defendant company to give an opinion as to "what kind of load we could put on that particular line" concerning Filger's application for water. He said he checked into the whole matter—elevation of the trailer park, elevation of the service tower at its highest water level and was of the opinion that not more than 20 gallons per minute should be served off the end of that line and the connection should not exceed ⅝-inch. He estimated the cost of constructing a 4-inch line from Brady Hills to near the trailer court would be $20,000.

The general duty of a public service company to furnish and supply its services is as stated in McQuillin Municipal Corporations, 3rd Edition, Volume 12, page 284: " * * * it is universally held that a public service company, * * * insofar as the services requested are reasonably within its range of performance, must furnish a supply or services, to any applicant, within the prescribed territory, * * *". And on page 559: "Mandamus lies in behalf of a patron to compel the furnishing of a supply or services which it is the duty of the public service company to provide * * *". And further on page 562: "On a wrongful refusal to furnish service * * * the patron may sue for damages".

From 34 Am.Jur. par. 199, page 970: "Ordinarily, a municipality or quasi municipality, such as a district organized to supply its inhabitants with water, gas, etc., is not bound to furnish a supply to everyone that demands it, regardless of the expense involved and the returns which will result in so doing. * * * As a general rule, the municipality which engages in furnishing water or other such supply to its inhabitants has a governmental discretion as to the limits to which it is advisable to extend its mains, and unless such discretion is abused, the decision of the municipality in the matter is determinative, and mandamus will not lie to control or review it. The writ has been refused when sought to compel a municipality or a water district to extend its water system or mains, * * *".

94 C.J.S. Waters § 278, page 143, states the rule this way: " * * * a water company engaged in supplying water to the public is bound to supply water without·discrimination to all persons within its zone of service who comply with its proper rules and regulations". The Supreme Court of Utah in North Salt Lake v. St. Joseph Water & Irrigation Co., 118 Utah 600, 223 P.2d 577, said that prior users have a right to be protected and those seeking subsequent connections are limited by amount of water available for use. And of course within these limitations such companies must respect the broad equitable precepts that all must be treated alike, that such corporations cannot pick and choose and that they may not indulge in actions which are arbitrary or capricious.

Plaintiffs have invited our attention to some rulings from foreign jurisdictions. In Reid Development Corp. v. Parsippany-Troy Hills Tp. et al., 10 N.J. 229, 89 A.2d 667, 669, defendant water company refused to extend its mains 600 feet in order to service a new residential development unless the lots had a frontage of at least 100 feet. The Supreme Court of New Jersey ruled such a requirement improper and unreasonable. The opinion declared the general rule in the following language,

with which we do not disagree: "The provision of water for the public and private uses of the municipality and its inhabitants is the exclusive province of the local agency; and it is elementary that the exercise of the power must be in all respects fair and reasonable and free from oppression. There can be no invidious discrimination in the extension of the service thus undertaken by the municipality as a public responsibility. Equal justice is of the very essence of the power. Impartial administration is the controlling principle. The rule of action must apply equally to all persons similarly circumstanced. There is a denial of the equal protection of the laws unless the water service be available to all in like circumstances upon the same terms and conditions, * * *. Persons situated alike shall be treated alike".

In Daley Construction Co., Inc., v. Planning Board of Randolph, 340 Mass. 149, 163 N.E.2d 27, the Supreme Judicial Court of Massachusetts ruled that a subdivision could not be denied water simply because to do so would aggravate an existing water shortage.

Rutan Estates, Inc. v. Town of Belleville, 56 N.J.Super. 330, 152 A.2d 853, holds it is unreasonable and arbitrary to demand that the last remaining unserviced parcel of land in the District, pay for the extensions of mains to it, when all other areas had not been subject to such assessments. It is our belief that the conclusions reached in all three of these cases are sound, but do not require a finding for plaintiffs under the facts here existing.

Apparently defendant seeks to justify its action as the exercise of reasonable governmental discretion on three grounds: First, an inadequate supply of water to supply plaintiffs' probable and expected needs; second, allowing plaintiffs a 1½-inch tap would lessen pressure to other users along the 2-inch line to such an extent as to render their service wholly unsatisfactory, and third, primarily by reason of lack of funds, it would have been inexpedient to construct a new 4-inch line along the Old Pike Road.

In their original suit plaintiffs sued not only the water company but the five members of the Board, as individuals. Their petition alleged that defendant not only had an adequate supply out of which plaintiffs might be furnished, but that the individual board members formed a conspiracy to unlawfully defraud plaintiffs and to deny them a supply of water. Before the trial commenced, the action was voluntarily dismissed as to the individual defendants.

■■■ On appeal plaintiffs make one additional assignment of error, namely, the giving of Instruction No. 5, as suggested by defendant. We set out the instruction in full:

"The Court instructs the jury that under the law the management of the business and affairs and the exercise of the powers of defendant Public · Water Supply District # 1 is vested in its Board of Directors; that the Board of Directors does not have an absolute duty to serve all inhabitants of the District with the amount of water such applicant may request, but, in the exercise of their discretion as such Directors, may refuse to furnish water to an applicant in the quantity requested, provided, however, such decision is not arbitrarily arrived at as a result of *fraud* or caprice or in an effort to discriminate against any particular applicant.

"Therefore, you are instructed that if you find and believe from the evidence in this case that the Board allowed a ⅝ inch tap on a 2 inch dead end main located on Old Pike Road in Clay County, Missouri, and that such allocation was not the result of *fraud* or caprice on the part of said Directors or in an effort to discriminate against this particular applicant, but was the result of the good faith of

said Directors as to the amount of water that could be allocated to these plaintiffs without disruption or the denial of an adequate amount of water to those other customers in said district, if so, then your verdict will be for the defendant and against the plaintiffs on their petition, and this is true even if you find that the amount of water so allocated to these plaintiffs was inadequate for the plaintiffs in supplying water for their trailer court". (Italics added).

Plaintiffs say the vice in this instruction is found in the use of the word "fraud" therein and that a public service company board can act in "good faith" as used in the instruction and, nevertheless, be liable. The word "fraud" appears twice in the instruction and each time is coupled with "or"—"fraud or caprice or in an effort to discriminate" and "fraud or caprice on the part of said directors". Plaintiffs' own theory as to their entitlement is embodied in and was presented to the jury by Instructions 1 and 2. Instruction No. 1 hypothesized these facts— that plaintiffs requested a 1½-inch tap, offered to install their own tank, that they were offered only a ⅝-inch tap, that defendant had an adequate supply of water and that its refusal to furnish them with an adequate supply was "wrongful" and upon such findings authorized a verdict for plaintiffs. Instruction No. 2, immediately following, then defined "wrongful" as used in the instruction to mean "arbitrary, capricious or discriminatory".

We do not believe that Instruction No. 5 is in conflict with Instructions 1 and 2. All three, we think, properly declare the law and fairly present the issues. And in this case even though plaintiffs dismissed as to the individual defendants, they did offer evidence as to statements made by board director Berkebile, which would justify an inference of fraud. But Instruction No. 5 does not require the jury to find fraud. Rather it authorizes a plaintiff verdict upon a finding of either fraud or caprice or discrimination or failure to act in good faith. We do not believe it is commonly understood that an individual can act arbitrarily or capriciously or in a discriminatory manner and nevertheless be acting in good faith.

We find no reversible error. We think there was substantial, competent, admissible evidence upon which the jury might base its verdict and the Court its judgment.

Therefore, the judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.